```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MARYLAND


ANNA D. GREEN, et al.          *
                               *
v.                             *    Civil Action No. WMN-14-3132
                               *
BALTIMORE CITY BOARD OF        *
SCHOOL COMMISSIONERS           *
                               *
                               *
                               *
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**MEMORANDUM**

Before the Court is a Motion to Dismiss, or in the Alternative, for Summary Judgment filed by Defendant Baltimore City Board of School Commissioners (the Board), ECF No. 4, and a Motion for Summary Judgment filed by Plaintiffs Anna D. Green and Carolyn Richards. ECF No. 5. The motions are fully briefed and ripe for review. Upon a review of the papers, facts, and applicable law, the Court determines (1) that no hearing is necessary, Local Rule 105.6, (2) the Board's motion will be denied and (3) the Ms. Green and Ms. Richards' motion will be granted.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs Anna Green and Carolyn Richards bring this action under the Employee Retirement Income Security Act of 1974 (ERISA) as amended by the Comprehensive Omnibus Budget Reconciliation Act of 1986 (COBRA) against their former

employer, the Board, which manages the Baltimore City Public School System (the System).  Plaintiffs were employees of the System who were recommended for termination and suspended without pay.  When suspended, the System kept both Ms. Green and Ms. Richards on the employee roster, but maintained their workload at zero hours.  While still on the roster, the Plaintiffs remained eligible for coverage under the System's health care plan.  In fact, they remained automatically enrolled.  In general, a suspended employee of the System will be removed from coverage if he or she is finally terminated, fails to pay the premiums, or requests removal from coverage.

Ms. Green received her suspension letter on January 15th, 2013, which detailed the reasons why she was recommended for termination, a notice that she was being suspended without pay, and a note regarding procedure to learn more about her insurance options.  At that time, the Board adjusted her hours to zero but continued her medical insurance coverage under its Health Maintenance Organization (HMO) without further notice to Ms. Green.  Ms. Green first discovered that the Board continued her insurance coverage when medical care was mistakenly billed through the System plan rather than her new employer's plan.  On May 16, 2013, five months after she was notified that she would be suspended and recommended for termination, Ms. Green sent an e-mail to a System employee, stating that she wished to cancel

2

her coverage under the System's plan, that she did not elect to continue coverage, and did not know she was still being billed for coverage.  ECF No. 4-5 at 2.  The System then terminated her coverage and through CONEXIS, a contractor, sent an "Election Form and Plan Alternatives Letter," which established her date of coverage loss as March 31, 2013.

There is no record from January 15th to May 16th of communication between Ms. Green and the system regarding the option of continuing her health care coverage after her suspension beyond two bills dated April 4, 2013, for $704.56 and May 8, 2013, for $662.16, assessments that reflect both the employee and employer contributions to the insurance plan.  ECF No. 4-7.  The suspension letter dated January 15 discusses health insurance only to the extent that it states that "[Ms. Green] may contact the Office of Benefits Management to discuss the options available to you concerning the continuation of benefit coverage."  ECF No. 4-4 at 1.  A letter sent by the System dated before the suspension letter notified Ms. Green that her payroll location had changed and that if she "stop[ped] receiving a paycheck, [she] must continue to pay [her] healthcare premiums."  ECF No. 4-3.  What constituted her healthcare premiums, the letter did not elaborate further.

Ms. Richards received a similar suspension letter on September 16, 2013, at which point her hours were taken down to

3

zero.  The Board, again without further communication, continued Ms. Richard's coverage under the System's Blue Cross/Blue Shield Preferred Provider Network ("PPN") plan.  Ms. Richards, however, chose to forego medical treatment in the belief that she did not have continuing coverage under the System's plan.  ECF No. 5-4 ¶ 16.  Ms. Richards officially resigned her position on February 17, 2014.  On March 24, 2014, CONEXIS sent Ms. Richards a "COBRA Continuation Coverage Elections Notice," with the date of coverage loss set at March 31, 2014.  ECF No. 4-10.  Then, on April 2, 2014, the System issued an invoice in the amount of $4076.59 for both the employer and employee contributions to the insurance plan for the period covering September 16, 2013, to February, 28, 2014.  ECF No. 4-11.

Plaintiffs then brought this action for failure to provide timely notice and breach of fiduciary duty under the Employee Retirement Income Security Act of 1974 (ERISA) as amended by the Comprehensive Omnibus Budget Reconciliation Act of 1986, § 10002, Pub. L. No. 99-272 (codified as amended at 29 U.S.C. §§ 1161-1168) (COBRA).  In lieu of an answer, the Board filed a Motion to Dismiss or in the Alternative for Summary Judgment.  ECF No. 4.  Plaintiffs then filed a response to the Board's Motion and an independent Motion for Summary Judgment.  ECF No. 5.

**II.   LEGAL STANDARD**

The Board has filed a Motion to Dismiss or in the Alternative Summary Judgment while Plaintiffs have filed as their response a cross-motion for Summary Judgment.  Usually, in evaluating a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all well-pled allegations of the complaint and construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff.  See Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997).  A court considers only the pleadings when deciding a motion to dismiss.  If matters outside the pleadings are presented and not excluded, the motion must be considered under the summary judgment standard of Rule 56.  See Villeda v. Prince George's Cnty., 219 F. Supp. 2d 696, 698 (D. Md. 2002).  In this case, the parties have submitted matters outside the pleadings, and the Court has considered these matters.  Defendants' motions shall be considered a motion for summary judgment and decided accordingly.

Summary judgment is appropriate if the record before the court "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  See also Felty v. Graves-Humphreys Co., 818 F.2d

5

1126, 1128 (4th Cir. 1987) (noting that trial judges have "an affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial" (internal quotation marks omitted)).  A fact is material if it might "affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether there is a genuine issue of material fact, the Court "views all facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party."  Housley v. Holquist, 879 F. Supp. 2d 472, 479 (D. Md. 2011) (citing Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987)).

When both parties file motions for summary judgment, the court applies the same standards of review.  ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 45 n. 3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment – even where . . . both parties have filed cross motions for summary judgment.").  The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard."  Towne Mgmt. Corp. v. Hartford Accident and Indem. Co., 627 F. Supp. 170, 172 (D. Md. 1985).

**III. DISCUSSION**

COBRA imposes a statutory requirement that a plan administrator notify any employee who is covered by its insurance plan of his or her right to continue health insurance coverage for up to eighteen months after a "qualifying event." See 29 U.S.C. § 1166 (notice requirement); id. § 1162 (continuation coverage); id. § 1163(2) (a "qualifying event" is a termination or reduction in hours which, but for the continuation coverage required under COBRA, would result in the loss of coverage). A plan administrator has 44 days in which to notify the covered employee of his or her rights. See id. § 1162(a)(2) (providing 30 days for employer to notify healthcare administrator of qualifying event) and id. § 1166(a)(4)(A)(c) (providing 14 days for administrator to notify employee of continuation rights). See also Barnett v. Perry, Civ. No. 11-CCB-122, 2011 WL 5825987, at *6 (D. Md. Nov. 16, 2011).[1] It is undisputed that the Board is a plan administrator required to give notice and that Plaintiffs were covered employees to whom notice was due.

---

[1] The Board in its motion, without citation, uses a 90 day notice requirement. See, e.g., ECF No. 4-1 at 2. Whether the 90 or the 44 day window is used, the analysis is the same: if the "qualifying event" is Plaintiffs' suspension, then the Board violated COBRA notice requirements, but if it is when Plaintiffs took an affirmative step to end their coverage, then the Board did not violate COBRA.

7

**A. Counts I and III – Violations of 29 U.S.C. § 1166**

While the parties agree that the System has an obligation to Ms. Green and Ms. Richards to inform them of their COBRA rights upon the occurrence of a "qualifying event," the parties dispute what constitutes the relevant qualifying event. Plaintiffs argue that they experienced the same qualifying event when each was suspended, had their hours set to zero, and were required to pay both the employee and employer share of the insurance premiums. If their suspension is set as the relevant "qualifying event" under COBRA, then the System grossly violated its obligation, as it delayed sending notice to Ms. Green and Ms. Richards by over six months.

The Board argues that Ms. Green and Ms. Richards experienced unique qualifying events – Ms. Green when she e-mailed the System in May 2013 to request an end to her coverage, and Ms. Richards when she officially resigned in March 2014. Thus, in the Board's view, the letters sent to each from CONEXIS were well within the window required by COBRA – 32 days for Ms. Green and 36 days for Ms. Richards. The Board further argues in support of its position that "the reduction of hours alone is not a qualifying event triggering the notice requirement. The reduction of hours must be accompanied by a loss in coverage." ECF No. 4-1 at 9.

The Board is correct in its summation of the law that a reduction in hours alone is not sufficient to trigger its COBRA duties.  The Board, however, too narrowly construes "loss of coverage" as going from eligible to ineligible for coverage.  It argues that because "the Board does not terminate insurance for any of its employees, regardless if they are working zero hours, until they have ensured that their employees have explicitly sought termination of their benefits," it is not obligated under COBRA to send notice until that termination occurs.  ECF No. 4-1 at 11-12.  The Department of the Treasury – which is charged with promulgating regulations for COBRA – defines "loss of coverage" more broadly.  The regulation states that to lose coverage "means to cease to be covered under the same terms and conditions as in effect immediately before the qualifying event."  26 C.F.R. § 54.4980B-4(c).[2]  The regulation then defines as a loss in coverage "[a]ny increase in the premium of contribution that must be paid by a covered employee . . . for coverage under a group health plan that results from the occurrence of one of the events."  Id.  It is undisputed that

---

[2] The Board, in essence, acknowledges this as the correct standard when, in analyzing Barnett, 2011 WL 5825987, supra, and Aquilino v. Solid Waste Services, Civ. No. 2:07-cv-928-LDD, 2008 U.S. Dist. LEXIS 47168 (E.D. Pa. June 13, 2008), to support its argument, the Board notes that "[t]o lose coverage under a group health plan means to cease to be covered under the same terms and conditions as in effect immediately before the qualifying event" was "the language which the Barnett and Aquilino Courts relied on to deny summary judgment."  ECF No. 4-1 at 11.

Ms. Green and Ms. Richards saw an increase in the premium of contribution once they were placed indefinitely on leave without pay. Prior to being placed on leave without pay, Ms. Green was obligated to pay 5% of her insurance premiums and Ms. Richards was obligated to pay 18.5%, while the System paid the remaining insurance premiums. Once they were suspended, Plaintiffs were required to pay 100% of premiums, as assessed by the System in the bills sent to Plaintiffs. The increase in premiums constituted a "loss in coverage" which was a direct result of their reduction in hours. The reduction of hours[3] that occurred when they were suspended without pay was, therefore, a qualifying event. As a result, the Board's COBRA obligations were triggered on January 15, 2013, for Ms. Green and September 16, 2013, for Ms. Richards.

The Board asserts that, through its handling of Ms. Green and Ms. Richards' cases, "[t]he Board's actions were consistent with the purpose of ERISA; that no employee is left without coverage upon the occurrence of a qualifying event." ECF No. 4 at 12. Their practice, though, does not fulfill the equally important purpose of COBRA of providing sufficient notice such

---

[3] The parties do not dispute that Ms. Green and Ms. Richards' situation falls under the "reduction in hours" event eligible under 29 U.S.C. § 1163(2). See ECF No. 4-1 at 8 ("It is undisputed that Plaintiffs Green and Richards had their hours reduced to zero while employed with City School.") and ECF No. 5-1 at 13 ("When [the BCPSS placed Plaintiffs on leave without pay], it reduced each Plaintiff's hours to zero.").

that the employee "could make an informed and intelligent decision whether to elect continuation coverage." Roberts v. Nat'l Health Corp., 133 F.3d 916, 916 (4th Cir. 1998). At the time of their suspension notice, Ms. Green and Ms. Richards were neither made aware that their insurance coverage would be continued automatically nor were they informed that such continuation would mean that they would be obligated to pay both the employer and employee shares of the insurance premiums. The facts that coverage was presumed to continue and that Plaintiffs would incur a significant financial obligation as a result are so essential that making an informed decision regarding coverage without those facts would be difficult if not impossible. The invitation in the suspension letter to "contact the Office of Benefits Management to discuss the options available" fails to even hint that the terms and conditions of coverage were to change. Therefore, the Board did not meet its notification obligations under COBRA and the Court will grant summary judgment to Plaintiffs on Counts I and III.

**B. Counts II and IV – Violations of 29 U.S.C. § 1104**

As to Counts II and IV, the Board seeks dismissal of the Plaintiffs' breach of fiduciary duty claims on multiple grounds. First, the Board argues that "when bringing a claim for breach of fiduciary duty under ERISA, the claim must rest upon an 'interpretation and application of ERISA' rather than be claim

that rest [sic] upon the 'interpretation and application of an ERISA-regulated plan." ECF No. 4-1 at 13 (quoting Smith v. Sydnor, 184 F.3d 356, 362 (4th Cir. 1999)).  It further argues that if the issue is the "interpretation and application of an ERISA-regulated plan" then Plaintiffs must have exhausted their administrative remedies before filing their claim of breach of fiduciary duty.  Although Plaintiffs have followed the Board's framework and countered that each of their claims are based in ERISA and not an ERISA-based plan, the Board has miscast Smith v. Sydnor.

The holding of Sydnor is that "the exhaustion requirement does not apply to a claim for breach of fiduciary duty." 184 F.3d at 357.  The Board disregards this clear holding and instead casts the relevant test of whether administrative remedies need to be exhausted as whether the fiduciary breach complaint is based in the application of ERISA or an ERISA-based plan.  This test, however, was used in Sydnor not to determine whether a fiduciary duty claim needed to go through administrative procedures but instead to determine whether a fiduciary claim was a re-casted denial of benefits claim. Id. at 362 ("In sum, [the precedent relied upon by the District Court][4] and [prior 4th Circuit law][5] instruct us that a claim for

---

[4] Drinkwater v. Metropolitan Life Ins. Co., 846 F.2d 821 (1st Cir. 1988); Simmons v. Willcox, 911 F.2d 1077 (5th Cir. 1990).

12

breach of fiduciary duty is actually a claim for benefits where the resolution of the claim rests upon an interpretation and application of an ERISA-regulated plan rather than upon an interpretation and application of ERISA."). The Board does not argue, and the record does not support, an assertion that Plaintiffs have asserted a re-casted denial of benefits claim. As such, the rule in Sydnor that "the exhaustion requirement does not apply to a claim for breach of fiduciary duty" applies here.

Next, the Board argues that Counts II and IV should be dismissed because Plaintiffs' claim for damages benefits the individual Plaintiffs and not the plan beneficiaries as an entire group. ECF No. 4-1 at 16. Under ERISA, "damages for breach of fiduciary duty inure to the benefit of the plan as a whole rather than to individuals." Sydnor, 184 F.3d at 363; see also Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134 (1985). The Board argues that, because Counts II and IV state that "Defendant BOARD is liable to Plaintiff [Green/Richards] for the actual damages sustained by Plaintiff," ECF No. 1 ¶¶ 40,51, Plaintiffs have asked this Court to grant relief to Plaintiffs individually rather than to the plan as a whole. In their claim for relief, however, Plaintiffs include a request

---

[5] Coyne & Delany Co. v. Blue Cross & Blue Shield, 102 F.3d 712 (4th Cir. 1996).

for this Court to "[d]eclare all invoices and bills issued by Defendant BOARD for unauthorized continuation of coverage after a COBRA qualifying event are null and void and of no effect." Id. ¶ C. The prayer also requests, for example, that this Court "[d]eclare that Plaintiff Green suffered a qualifying event on January 14, 2013, and that such qualifying event obligated Defendant BOARD to honor and effectuate the rights granted and due under COBRA." Id. ¶ A. To grant such relief would implicate all plan beneficiaries as that relief relates to the Board's practice of notifying suspended employees of their rights. The reading of the prayer for relief may be ambiguous as to its reach, but as the Court is required to construe all inferences to the benefit of Plaintiffs as the non-moving parties, the Court finds that Plaintiffs have adequately pled remedies that will benefit plan members as a whole and not just the individual Plaintiffs.[6]

Finally, the Board spends a paragraph asserting that "Plaintiffs have failed to assert how the Board breached any duty to the entire plan under ERISA" and that "the alleged actions by the Board do not amount to 'misuse and mismanagement of the plan assets' as required by the Supreme Court." ECF No.

---

[6] The Court notes that, although it disagrees with the Board's contention that Plaintiffs' prayer for relief is not sufficiently pled to benefit the whole plan, the Court, for reasons discussed below, declines to find at this time that such relief is appropriate.

14

4-1 at 16.  The Board cites Massachusetts Mutual to support the proposition that an administrator only violates his fiduciary duty through misuse and mismanagement of plan assets.  The Court in Massachusetts Mutual, however, was describing the concerns of lawmakers as it related to one of many duties charged to a fiduciary.  473 U.S. at 141 ("A fair contextual reading of [11 U.S.C. § 1109] makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than the rights of an individual beneficiary.").  In addition to that duty, the Supreme Court also identified a broad range of duties imposed on fiduciaries by ERISA, relating to "the proper management, administration, and investment of fund assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest."  Id. at 143.

Plaintiffs have demonstrated a failure of one of those specific duties, namely the disclosure of required information.  "[T]he duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA."  Gross v. St. Agnes Health Care, Inc., Civ. No. 12-ELH-2990, 2013 WL 4925374, at *15 (D. Md. Sept. 12, 2013) (quoting Eddy v. Colonial Life Ins. Co. of America, 919 F.2d 747, 750 (D.C. Cir. 1990)).  "ERISA

15

administrators have a fiduciary obligation 'not to misinform employees through material misrepresentations and incomplete, inconsistent, or contradictory disclosures." Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371, 380 (4th Cir. 2001) (citation omitted). Specifically, the fiduciary "is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection." Id. (quoting Restatement (Second) of Trusts § 173 cmt. d.). In Gross, which is illustrative to the case at hand, the plaintiff continued to pay premiums on her life insurance for her divorced husband as an eligible spouse despite the fact that divorced spouses were ineligible for coverage. This Court found that the defendant had violated its fiduciary duty as the plaintiff continued to pay premiums in reliance on defendant's communications that her ex-husband was eligible for coverage even though it was in possession of information that clearly explained otherwise.

The plaintiffs in Gross and in the instant case chose a course of action as a direct result of their plan administrators making incomplete disclosures to them as beneficiaries. The Board asserts that the note in the suspension letters that Plaintiffs "may contact the Office of Benefits" to discuss options is a sufficient affirmative statement that met the

16

Board's fiduciary duty to provide information to its beneficiaries. "May" suggests that pursuing further coverage was an option, not automatically assumed, and both Ms. Green and Ms. Richards made decisions regarding their coverage accordingly. An "incomplete" disclosure such as the one made by the Board may constitute a violation of a fiduciary duty as much as an omission and, as discussed above, to say that the Plaintiffs had the option of talking to someone in human resources about continuing insurance options failed to indicate the real financial obligation of automatically continuing healthcare coverage, a material fact that would bear directly on the interests of Ms. Green and Ms. Richards.[7] As such, the Court finds that the Board breached its fiduciary responsibility to disclose how the System would handle continuing health insurance coverage after Plaintiffs were suspended without pay.

A party may succeed on a claim for breach of fiduciary duty if it demonstrates "(1) that a defendant was a fiduciary of the ERISA plan, (2) that a defendant breached its fiduciary responsibilities under the plan, and (3) that the participant is in need of injunctive or other appropriate equitable relief to remedy the violation or enforce the plan." Adams v. Brink's

---

[7] The effect of the Board's incomplete disclosures on Ms. Richards is particularly acute, as she chose to forego medical care under the belief that she was no longer covered by the System's health insurance.

Co., 261 F. App'x 583, 595 (4th Cir. 2008). The Board does not argue that it was not acting in a fiduciary capacity when it communicated with Ms. Green and Ms. Richards, and the outstanding bills assessed by the Board to Plaintiffs demonstrate a need for relief under ERISA. Thus, the Court will grant Plaintiffs' Motion for Summary Judgment on Counts II and IV.

**IV. CONCLUSION**

For the reasons stated above, the Plaintiffs' Motion for Summary Judgment will be granted and the Court will issue a declaration that Plaintiffs suffered a qualifying event on the dates of their suspension, triggering Defendant's obligations under COBRA, and that all invoices and bills issued by Defendant to Plaintiffs Green and Richards after the qualifying event are null and void.[8]

```
                           _____/s/_____
                           William M. Nickerson
                           Senior United States District Judge
```

DATE: January 22, 2015

---

[8] Plaintiffs' Proposed Order, ECF No. 5-2, includes declarations that affect all plan beneficiaries, an award of attorneys' fees, and a monetary award. Because the Proposed Order contains broader relief than requested in the Complaint and neither party addressed in its briefing the scope of relief appropriate to this action, the Court declines to grant further relief at this time. If Plaintiffs believe further relief is necessary, they may move the Court for such relief within 14 days of this Order.